**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OLYMPIC RESTAURANTS LLC<br>*Debtor* | CASE NO. 20-14537<br>JUDGE HARRIS<br>CHAPTER 11<br>SUBCHAPTER V |

**OLYMPIC RESTAURANTS LLC'S PLAN OF REORGANIZATION DATED APRIL 9, 2021**

This Plan of Reorganization Dated April 9, 2021 ("Plan") is being filed by the debtor and debtor in possession, Olympic Restaurants LLC ("Debtor") under Subchapter V of Title 11 of the United States Bankruptcy Code.

## Article 1:    Background of This Case

### 1.01    Description and History of the Debtor's Business

The Debtor was formed in 2017 to own and operate Greek restaurants throughout the northern Ohio area. Debtor currently owns and operates the Simply Greek restaurant at 33700 Aurora Road Solon Ohio (the "Location") Presently, Debtor has 7 employees.

### 1.02    Overview of the Debtor's Financial Structure

The debtor has no bank loan or other secured debt against its assets. It owes its current landlord $40,000 for past due rent arising from certain lease disputes which are described below. The debtor has certain unpaid withholding tax liability to the IRS. The IRS has filed Proof of Claim ("POC") No. 1 for $41,294.99 of which $37,112.83 is a priority tax claim. The debtor has scheduled the Ohio Department of Taxation ("ODOT") with a priority claim of $3,770.38 but ODOT filed POC No. 2 for $15,909 of which $9,937.57 is claimed to be a priority tax claim. However, most of this seems to be for sales taxes that are from periods where the Debtor was not operating so the Debtor believes it is in error and not a valid claim against the estate. Finally, the Debtor scheduled the Regional Income Tax Agency with a priority tax claim of $2,906.86. The debtor has approximately $14,000 in other unsecured nonpriority claims not including Ms. Longo, the IRS, or ODOT.

### 1.03    Description of Events Leading to Bankruptcy Filing

This is the Debtor's second bankruptcy filing, arising from ongoing disputes with its landlord. Debtor leases the Location from Gloria Longo. Ms. Longo and the Debtor executed a lease for the premises occupied by the Debtor on May 19, 2016. Article II of the lease sets forth that the Debtor would undertake to make improvements to the Location and to get it ready to use as a restaurant. The lease however contained no abatement of rent for the buildout period, which meant that the Debtor had to fund the buildout and pay full rent while having no income. The Debtor did build out the Location but, this process took an inordinately long time due to there being no cash income, but also in part because of delays in getting permits from the City of Solon relating to issues dealing with the maintenance of the Location, which delayed getting necessary permits or approvals.

1

As a result, a process that should have taken approximately 4 to 6 months to complete, instead took almost 39 months. The Debtor, therefore, did not commence operation as a restaurant until August 26, 2019.

The lease was for an initial three-year term, with automatic renewals for two additional five-year terms. Even though the Debtor had not been able to open the restaurant, it was automatically renewed by its terms on July 1, 2019.

Ms. Longo improperly posted a three-day notice to leave the premises on July 17, 2019, allegedly for nonpayment of rent which was disputed by the Debtor. This action, her actions regarding the Debtor's sign, and a dispute over turning on a cooler which was specifically mentioned in the lease was the subject of the Common Pleas Court case filed by the Debtor against her to enjoin this and other conduct.

Nevertheless, the Debtor only received approval from the health department by taking the doors off the cooler for a time and using it as warm storage. This required the Debtor to move cooling equipment into the premises from Simply Greek Uptown LLC. Pictures of the before and after are attached as Exhibit A

Attached to the Common Pleas complaint was a copy of a bank check for $16,254 to cure any default in rent[1]. The Debtor tendered that check and other certified bank funds and checks to Ms. Longo in an attempt by the Debtor to pay the rent that the Debtor believes totals $27,378.00. However, Ms. Longo refused to accept the rent preferring instead to proceed with an eviction proceeding. To date tendering the fees incurred in the civil litigation in state court both in Common Pleas and in Bedford Municipal Court the cost of filing the prior bankruptcy case and this case the Debtor to incur more than $60,000 in legal fees which could have been paid to her other creditors.

The precipitating event leading to the most recent filing was a threat from Ms. Longo, despite the pending eviction proceeding in Bedford Municipal Court, to engage in self-help and lockout the Debtor the day it filed this case.

The Debtor's business was severely impacted by COVID-19, especially in the early part of 2020. Even though its business has continued to improve, and the Debtor did manage to retain its seven employees with no reduction in their time, the cost of its operations has greatly increased in both the need for additional PPE and the cost of that equipment. For example, necessary food service gloves have over tripled in price since March 2020. Anticipated business from catering was essentially put on hold.

There are enormous differences between this case and the prior bankruptcy case by the Debtor. When that prior case was filed in November 2019, the Debtor had only been operating for approximately two months. Since that time and despite the COVID-19 pandemic, the Debtor has managed to grow its business and to keep its employees on its payroll. While it has struggled, if it can operate it will be able to pay its creditors in full in three years.

**1.04    Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest

---

[1] After tendering the check for months and having it refused, the funds were eventually used to pay Debtor's legal counsel in state court.

holders would receive in a chapter 7 liquidation. The liquidation analysis required by 11 U.S.C. § 1190 is attached to the Plan as Exhibit B.

**1.05    Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. Projections that support the Debtor's ability to make all payments required by the Plan are attached to the Plan as Exhibit C. *See* 11 U.S.C. § 1190.

The Debtor's financial projections show that the Debtor will have total projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) of $107,360.

The final Plan payment is expected to be paid on the third anniversary from the Effective Date of this Plan.

The Debtor's projection of income is based upon a significantly lower income for the first year of the Plan and a partial reduction in income for the second year of the Plan. This reduction is the result of the COVID-19 pandemic, because much of the Debtor's income is derived from catering for large outdoor events such as weddings and other festivals – events which are no longer allowed at the present to occur. The Debtor's budget assumes that by year three of the Plan, the COVID-19 pandemic will no longer impact the Debtor's business operations.

## Article 2:    Plan Summary

This Plan of Reorganization under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of the Debtor from the future cash flow of its business operations, financial relief payments, and possibly the sale of its operations as a going concern.

This Plan provides for:

> 1 class of priority claims;
> 1 classes of lease claims;
> 1 class of non-priority unsecured claims; and
> 1 class of equity security holders.

Non-priority unsecured creditors holding allowed claims will receive distributions over the which the Debtor has valued at approximately 100 cents on the dollar. This Plan provides for full payment of administrative expenses and priority claims. All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney if you have one. (If you do not have an attorney, you may wish to consult one.)**

## Article 3: Classification Of Claims And Interests

| | | |
|---|---|---|
| **3.01** | **Class 1.** | This class consists of all allowed claims entitled to priority under § 507(a) of the Code (except administrative expenses under § 507(a)(2) and priority tax claims under § 507(a)(8) dealt with in Article 3 below). The Debtor does not believe there to exist any remaining claims in Class 1 as all pre-petition wage claims were paid pursuant to a court order. |
| **3.02** | **Class 2.** | This Class consists of the claims of Ms. Longo. |
| **3.03** | **Class 3** | This Class consists of all non-priority unsecured claims not otherwise classified and allowed under § 502 of the Code. |
| **3.04** | **Class 4** | Equity interests of the Debtor. All of the membership interests in the Debtor are owned by Nick Moissis. |

## Article 4: Treatment Of Administrative Expenses, Priority Tax Claims, And Quarterly And Court Fees

| | | |
|---|---|---|
| **4.01** | **Unclassified claims** | Under section § 1123(a)(1), allowed administrative expenses and priority tax claims are not in classes. |
| **4.02** | **Administrative expenses** | If this Plan is consensually confirmed under § 1191 of the Code, Administrative expenses allowed under § 503 of the Code will be paid in full on the later of Effective Date of this Plan or when such claim arises, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. |
| | | If this Plan is not consensually confirmed under §1191 of the Code, administrative expenses allowed under §503 of the Code will be paid as follows consistent with Section 1191(e) of the Code: (1) Expenses arising in the ordinary course of business after the Petition Date shall be paid in full on the Effective Date, or according to the terms of the obligation, if later. All other administrative claims will be paid pro-rata, monthly, with other administrative claims and in the order of priority set forth in §§503 and 507 of the Code. |
| | | The Debtor estimates that it will owe its counsel $21,000 in legal fees as of the Effective Date of which $11,000 is covered by counsel's retainer, $3,500 to the Trustee in fees as of the Effective Date, and $5,000 in fees for its accountant as of the Effective Date. |

4

| 4.03 | Priority tax claims | The IRS allowed priority tax claim of $37,701.47 will bear interest at the rate specified in 26 U.S.C. §6621(a)(2) (currently 3%) and will be paid in full in monthly installments of $1,096.40 per month for 36 months from the filing date of this bankruptcy case. |
| | | The State of Ohio allowed priority tax claim of $3,770.38, will bear interest at 3% and will be paid in 36 monthly installments of $109.65 a month. |
| | | and the Regional Income Tax Agency allowed priority tax claim of $2,906.86 will bear interest at 3% and will be paid in 36 monthly installments of $85.54 a month. |
| 4.04 | Statutory fees | All unpaid fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan will be paid on or before the Effective Date. |
| 4.05 | Prospective quarterly fees | As a Subchapter V debtor there are currently no quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7). If these are subsequently reimposed, they will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. |

## Article 5:    Treatment Of Claims And Interests Under The Plan

**5.01    Class 1 – Priority Claims -- Impaired and entitled to vote on this Plan**

This Class consists of all allowed priority claims under § 507 of the Code except those in Section 4.03 of the Plan. Debtor believes there are no creditors in this class, as all wage claims were paid under a court order in this Case.

<u>Treatment</u>

Unless it agrees to a different treatment, any claimant holding an allowed claim in this Class shall be entitled to be paid in full, in deferred payments, on the allowed amount of their claim over the length of this Plan.

**5.02    Class 2 – Claims of Ms. Longo -- Impaired and entitled to vote on this Plan**

This Class consists of all allowed claims of Ms. Longo for back rent. The Debtor has scheduled the claim at $40,000.

<u>Treatment</u>

Ms. Longo's claim will be treated as follows:

<u>New Lease</u>

The Lease will be rejected and Ms. Longo  and the Debtor will enter into a new lease for a single 12-month term commencing as of January 1, 2021 on the same financial terms and conditions as the old Lease, a copy of which is attached as Exhibit D (the "New Lease") If the Debtor timely makes all payments of rent and cures' the arrearage as set forth below when due under the New

5

Lease, the Debtor will have the option to extend the term of the New Lease for one additional term of 36 months with a 3% annual increase in rent.

Landlord and Tenant agree that the amount of the arrearage under the Lease shall be set at $24,000 and paid in 12 monthly installments of $2,000 paid and due with each monthly rent payment on the Initial Term of the New Lease. Any cure payments due under this section that technically become due before Bankruptcy Court approval of their payment shall promptly be paid to Landlord on the Effective Date. Ms. Longo will waive any other claim against the Debtor or the bankruptcy estate.

In the event that the Debtor fails to pay any installment of rent or cure payment within 5 days of its due date, Longo shall, 5 days after the filing of a notice of such plan default with the court, the entitled to a surrender of possession of the location and the business premises, without further order of the court, and in the event debtor shall fail to voluntarily surrender such possession, Longo shall be entitled to enforce the plan default in her right of possession via a writ of possession directed to the US marshal to obtain such possession.

Confirmation of the plan shall also constitute a release by Debtor, its officers, directors, shareholders and employees of any claims relating to the dealings between debtor and Longo prior to the commencement of this case.

### 5.03    Class 3 – General Unsecured Claims -- Impaired and entitled to vote on this Plan

This Class consists of all general unsecured claims not otherwise classified or provided for in other provisions in this Plan. Only creditors holding allowed unsecured claims shall, as provided for in 11 U.S.C. §502(a), be entitled to receive a distribution according to the Treatment provided for in this Class.

**Treatment**

Allowed unsecured claims will be paid annually pro-rata from the Debtor's Projected Disposable Income, as defined in 11 U.S.C. § 1191(d), after and subject to the payment of Administrative Expenses and Priority Tax Claims provided for in Article 3 of this Plan, and payment to all other Classes above. No interest shall accrue on any Claims in this Class.

### 5.04    Class 4 – Equity holders -- Unimpaired and not entitled to vote on this Plan

This class consists of the outstanding stock issued by the Debtor, all of which is owned by Nick Moissis.

**Treatment**

Confirmation of this Plan shall cause all prepetition membership interests issued by the Debtor to be revested in and retained by those persons holding a membership interest in the Debtor as of the Petition Date and shall be subject to and based upon the terms and conditions as they existed on the Petition Date including under any executed company documents.

## Article 6:    Allowance And Disallowance Of Claims

### 6.01    Disputed claim.

A disputed claim is a claim that has not been allowed or disallowed and as to which either:

(i) A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii) No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**6.02    Delay of distribution on a disputed claim.**

No distribution will be made on account of a disputed claim unless and until it is allowed.

**6.03    Settlement of disputed claims.**

The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

**6.04    Untimely claims.**

Subject to the provisions of § 502, untimely claims are disallowed, without the need for formal objection, unless allowed by court order.

## Article 7:    Provisions For Executory Contracts And Unexpired Leases

**7.01    All Other Executory Contracts And Unexpired Leases**

Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, either before the Effective Date of this Plan, under the terms of this Plan or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 45 days after the Effective Date.

## Article 8:    Means For Implementation Of The Plan

The Plan will be implemented and funded through the future business operations of the Debtor. As a part of its reorganization, the Debtor does not contemplate the sale of any assets except that assets may be sold to the extent that it is later determined they are no longer of value to the Debtor's business operation or their useful life for the Debtor has expired.

The Debtor may however seek to sell its operations as a going concern. So long as such a sale produces the same amount of the Projected Disposable Income due under this Plan on or before the final date of this Plan, no court approval of the sale or modification of this Plan shall be necessary. The Debtor (or the Trustee if applicable) may prepay any amount due or any Allowed Claim in whole or in part without penalty at any time after the Effective Date.

According to 11 U.S.C. § 1129(a)(5), it is disclosed that the current officers and directors of the Debtor, who are also the sole shareholder of the Debtor, will continue to serve in their respective capacities for the Reorganized Debtor after confirmation of this Plan. Each Director and Officer shall serve under applicable non-bankruptcy law and the Debtor's membership or agreements, as each of the same, may be amended from time to time. At this time, the addition of future officers and directors is not contemplated.

The Debtor does not expect to obtain any third-party financing to implement the Plan but discloses that to the extent it is eligible for any funding or financial assistance based upon the

COVID-19 pandemic, it will seek such funding and/or assistance. The Debtor expects to have sufficient cash on hand to make the payments required on the Effective Date.

## Article 9:    Vesting

Under 11 U.S.C. § 1141(b), on Confirmation of the Plan, all property of the estate will revest in the Reorganized Debtor, except as otherwise provided in the Plan or the Confirmation Order.

Under 11 U.S.C. § 1141(c), on Confirmation of the Plan, all property of the Debtor dealt with in the Plan, tangible and intangible, including, without limitation, licenses, furniture, fixtures, and equipment, will revert, free and clear of all Claims and Equitable Interests of the Debtor, except as otherwise provided in the Plan or the Confirmation Order.

## Article 10:   General Provisions

**10.01   Definitions and rules of construction.**

The definitions and rules of construction outlined in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:

**Administrative Claimant**: Any person entitled to payment of an Administration Expense.

**Administrative Convenience Class:** A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

**Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of reserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

**Administrative Tax Claim**: Any tax incurred according to Section 503(b)(1)(B) of the Code.

**Allowed Claim**: Except as otherwise specified in this Plan, any claim against the Debtor according to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order

.**Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**Allowed Secured Claim**: Except as otherwise specified in this Plan, Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code

**Allowed Unsecured Claim**: An Unsecured Claim to the extent it is or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**Bankruptcy Court**: The United States Bankruptcy Court for the Northern District of Ohio.

**Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks, and commercial paper of any entity, including interest accrued or earned thereon.

**Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code.

**Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided, however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan under the provisions of chapter 11 of the Bankruptcy Code.

**Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

**Debtor** and **Debtor-in-Possession**: The Debtor, Olympic Restaurants LLC, the debtor-in-possession in this Chapter 11 Case.

**Disposable Income**: Shall have that meaning ascribed to such term under § 1191(d) of the Code

**Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged, or otherwise disputed.

**Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

**Equity Interest**: An ownership interest in the Debtor.

**Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

9

**Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified, or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**Petition Date**: October 8, 2020, the date the chapter 11 petition for relief was filed.

**Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**Reorganized Debtor**: The Debtor after the Effective Date.

**Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

**Trustee**: Bridget Franklin, the trustee appointed according to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**Untimely Claim**: Any Proof of Claim not timely filed with the Bankruptcy Court in the Case

## 10.02  Effective Date.

The effective date of this Plan is the day is the first business day that is 14 days after the Confirmation Order becomes a Final Order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Federal Rule of Bankruptcy Procedure 9006(a)(1).

## 10.03  Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

## 10.04  Binding effect.

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

## 10.05  Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

## 10.06  Controlling effect.

Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Ohio govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

## 10.07  Retention of Jurisdiction.

The Court shall retain jurisdiction to the full extent necessary to administer this case after Plan confirmation and to adjudicate any related adversary proceedings or contested matters, including

those relating to the Plan, such as concerning the Plan's construction, implementation, or modification or the New Lease. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## Article 11:  DISCHARGE

If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt: (i) on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## Article 12:  PAYMENTS

Unless specified otherwise in the Plan, if the Plan is confirmed under §1191(a), payments due under the Plan shall be made by the Debtor to the Trustee for distribution to Creditors provided for in the Plan and under §1194(a) of the Code. Once the Trustee's service is terminated under § 1183(c), the Debtor shall make Plan payments except as otherwise provided in the Plan or in the order confirming the Plan.

If the Plan is confirmed under section § 1191(b), except as otherwise provided in the Plan or in the order confirming the Plan, the Debtor shall make all payments to the Trustee for distribution to Creditors provided for in the Plan according to §1194(b) of the Code.

## Article 13:  LENGTH OF PLAN

Unless otherwise ordered by the Court, the length of this Plan shall be 3 years, commencing on the Effective Date.

## Article 14:  TAX CONSEQUENCES OF PLAN

The Plan and the resulting tax consequences may be complex, and the tax consequences of the Plan will depend upon certain factual determinations.  No ruling has been or will, before the Effective Date, be requested from the Internal Revenue Service regarding the tax consequences of the Plan.  No assets of the Debtor have been sold or transferred since the filing of this case and as a result, no tax consequences as to such assets have arisen since the filing of this case.

**BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES THIS DISCLOSURE STATEMENT RENDERS NO TAX ADVICE ON THE TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO ANY PARTICULAR CREDITOR, THE DEBTOR, OR INTEREST HOLDERS. EACH PARTY IS URGED TO CONSULT A TAX**

**ADVISOR AS TO THE TAX CONSEQUENCES OF THE PLAN INCLUDING ANY CONSEQUENCES UNDER STATE OR LOCAL TAX LAWS**.

The following constitutes a summary of the potential tax consequences which may arise upon confirmation of the Plan.

## 14.01   Tax Consequences to the Debtor.

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year, which generally includes the amount of principal debt discharged and any interest that has been previously accrued and deducted for tax purposes but remains unpaid at the time the indebtedness is discharged. The Tax Code permits a debtor in bankruptcy to exclude its COD Income from gross income but requires the debtor to reduce certain tax attributes by the amount of the excluded COD income. The Debtor will likely realize a significant amount of COD income upon the consummation of the Plan. The Debtor will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case.

## 14.02   Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

The U.S. Federal Income Tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims under a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. Also, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by several factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction for the underlying claim.

Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests to avoid penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein, and (C) holders of Claims and Equity Interests should

seek advice based on their particular circumstances from an independent tax advisor.

Dated:  April 9, 2021

*/s/ Pete Moissis*
Pete Moissis
Operations Manager

EXHIBIT
A



## Exhibit B Liquidation Analysis

| Asset | Scheduled Value | Liquidation Value | Note |
|---|---|---|---|
| | | | |
| Cash | $8,028.13 | $8,028.13 | |
| Security Deposits | $2,100.00 | $0.00 | Paid to Longo and East Ohio Gas |
| Food | $3,000.00 | $0.00 | |
| Restaurant Equipment and Fixtures | $5,000.00 | $5,000.00 | |
| Golf Cart | $3,000.00 | $3,000.00 | |
| Licenses | $0.00 | $0.00 | |
| Total | | $16,028.13 | |
| LESS | | | |
| Broker fees and Commissions (10%) | | $800.00 | |
| Trustee Fees | | $2,352.81 | |
| **Net to Creditors** | | **$12,875.32** | Paid to Priority Claims |

## Exhibit C Cash Flow Projection

### 2021

| | |
|---|---|
| Gross Sales | $540,000.00 |
| EXPENSES | |
| Labor | $240,000.00 |
| Rent | $22,248.00 |
| Utilities/Insurance | $13,000.00 |
| Advertising | $10,000.00 |
| Misc | $12,000.00 |
| Food | $151,200.00 |
| Dry Goods | $24,000.00 |
| Professional Fees | $12,000.00 |
| TOTAL EXPENSES | $484,448.00 |
| **Net Income** | **$55,552.00** |

### 2022

| | |
|---|---|
| Gross Sales | $567,000.00 |
| EXPENSES | |
| Labor | $252,000.00 |
| Rent | $22,915.44 |
| Utilities/Insurance | $14,000.00 |
| Advertising | $12,000.00 |
| Misc | $13,000.00 |
| Food | $158,760.00 |
| Dry Goods | $26,000.00 |
| Professional Fees | $12,000.00 |
| TOTAL EXPENSES | $510,675.44 |
| **Net Income** | **$56,324.56** |

### 2023

| | |
|---|---|
| Gross Sales | $595,000.00 |
| EXPENSES | |
| Labor | $265,000.00 |
| Rent | $23,000.00 |
| Utilities/Insurance | $14,000.00 |
| Advertising | $11,000.00 |
| Misc | $12,000.00 |
| Food | $166,600.00 |
| Dry Goods | $26,000.00 |
| Professional Fees | $13,000.00 |
| TOTAL EXPENSES | $530,600.00 |
| **Net Income** | **$64,400.00** |

| | |
|---|---|
| **Projected Disposable Income** | $176,276.56 |

<u>**LEASE**</u>

This lease agreement ("Lease") is made as of January 1, 2021, between Gloria Longo ("Landlord") and Olympic Restaurants LLC ("Tenant") for itself and as the debtor and debtor in possession, under the bankruptcy case *In re Olympic Restaurants LLC* Case No. 20–14537 Subchapter V of Title 11 of the United States Bankruptcy Code ( "Bankruptcy Case" and the court supervising the Bankruptcy Case the "Bankruptcy Court"). This lease replaces a prior lease agreement between Landlord and Tenant made as of May 19, 2016, for the Premises described in Section 1.01 below ("Prior Lease").

## Article 1:   Grant and Term

### 1.01   Premises

In consideration of the rents, covenants and agreements herein contained, Landlord hereby demises and leases unto Tenant and Tenant rents from Landlord the real property now known as the Simply Greek restaurant at 33700 Aurora Road Solon Ohio and measuring approximately 1300 square feet ("Premises").

### 1.02   Common Areas

The Premises are part of a strip shopping center ("Center"). During the term of this lease, Landlord grants to Tenant and Tenant's customers and invitees a nonexclusive license to use in common with all others to whom Landlord has or may hereafter grant the license to use the same common areas located within the Center. Tenant shall keep the common areas in front of its store free and clear of litter, trash, and other debris resulting from or attributable to its operations. Tenant agrees to maintain the sidewalk areas directly in front of the Premises and directly outside the rear door of the Premises in a way that keeps each area free from ice, snow, and debris.

### 1.03   Initial Term

The term of this lease and possession shall be one year beginning on January 1, 2021 and ending on December 31, 2021 ("Initial Term").

### 1.04   Option to Renew

If Tenant makes all rent payments under Section 2.01, and all Arrearage Cure Payments under 2.06 below when due, Tenant shall have the option to renew this lease for one 36 month term commencing on January 1, 2022, and ending on December 31, 2025, with a 3% annual increase in rent on January 1 of each option year.

## Article 2:   Rent, Arrearage Cure, CAM, Utilities, and Security Deposit

### 2.01   Rent

The rent for the Initial Term shall be $22,248 payable in monthly installments of $1,854 due on the 15th of each month.

### 2.02   Arrearage Cure Payments

Landlord and Tenant agree that there is an arrearage due under the Prior Lease to Landlord that is being addressed in a Plan of Reorganization filed by Tenant in the Bankruptcy Case. Those payments are the "Arrearage Cure Payments."

1



**EXHIBIT**

**D**

### 2.03    Common Area Maintenance Charge

There are no common area maintenance charges. Tenant's pro-rata share of common area maintenance is included in the rent, including real estate taxes, insurance costs, and all other common area maintenance.

### 2.04    Utilities

Tenant covenants and agrees with the Landlord to pay, when due, all: electric, gas, sewer, and water furnished to the Premises for the term, at the rate the utility or municipalities supplying the service according to the readings of the meters measuring the quantity furnished. Such utilities sell be separately metered to the Premises and such payment shall be made directly to the supplying utility company or municipality, other than for water and sewer as there is no separate water meter for the Premises. For water and sewer during the Initial Term the Tenant Shall pay $100 per month with the rent; such amount to be readjusted to the actual water usage on the Premises at the end of the term by a credit or additional rent due for the Option to Renew. Thereafter Tenant shall pay only the amount of actual water usage. Landlord shall provide to Tenant copies of all water bills for any meter at the Center from July 2019 that provides service to the Premises and shall specify how much water was used as a result of Tenant's activities in the Premises.

### 2.05    Security deposit

Landlord acknowledges that Tenant has deposited with Landlord a security deposit of $1,800 under the Prior Lease and that amount shall remain as security for the full prompt and faithful performance by Tenant of all its obligations hereunder.

## Article 3:    Build up, Possession, and Surrender of Premises

### 3.01    Build Up

Landlord and Tenant agree that Tenant has taken possession and at its sole cost and expense completed all improvements and other work to the Premises to begin his business operations, and has fully equipped the Premises with all trade fixtures, furniture, furnishings, floor coverings, signs, all special equipment, and other items of personal property necessary for its business operations, and that all work performed by the Tenant to date has been performed and completed in a workmanlike manner, by duly qualified, and if necessary, licensed persons or entities without interference or disruption of the operation of other Tenants or users of the Center, and has been completed per all applicable laws ordinances rules, rulings, regulations, and requirements of any governmental authority having jurisdiction over the Premises. Landlord and Tenant further agree that all work performed by the Tenant has been completed lien free.

If Tenant desires to make any future alterations or modifications to the Premises, such modification shall only be commenced upon approval by the Landlord, which approval shall not be unreasonably withheld, and Landlord shall make such determination within 3 days after a written request from Tenant. Any such work undertaken shall be and at Tenant's sole cost and expense, and all such improvements and other work to the Premises shall be performed and completed in a workmanlike manner, by duly qualified, and if necessary, licensed persons or entities without interference or disruption of the operation of other Tenants or users of the Center, and completed under all applicable laws ordinances rules, rulings, regulations, and requirements of any governmental authority having jurisdiction over the Premises, and all work

performed by the Tenant shall be completed lien free. Tenant at Tenant's sole cost and expense shall obtain all inspections necessary from the city of Solon and/or permits and licenses required by applicable government authorities for Tenant's use of the Premises.

## 3.02    Possession and Surrender of Premises

Tenant has taken possession of the Premises in the condition in which they were upon the execution of the original lease. Tenant shall not permit the Premises to be vacant during the term of this lease and at the end of the term of this lease shall deliver all keys to Landlord and leave the Premises broom clean and in good condition and repair, ordinary wear and tear excepted. All merchandise, property, material, or waste left in the Premises or adjacent exterior areas by Tenant at the end of the term may be removed and disposed of by Landlord without notice to Tenant.

## 3.03    Signs

Landlord and Tenant agree that Tenant has installed two illuminated signs advertising Tenant's business, which are fully compatible as to size, color, type, and style with other signs on the Center, and which conform to the signed specifications of the city of Solon. Tenant shall maintain Tenant sign in good order and repair, remove Tenant's sign when necessary to permit building repairs and in any case, not later than at the end of the term of this lease, and repair at Tenant's own cost and expense any damage to the Premises caused by the installation and/or removal of Tenant signs. Landlord approves the design of Tenant signs, and acknowledges their approval by the city of Solon.

## 3.04    Trade fixtures

At the termination of this Lease, Tenant may remove the trade fixtures and/or equipment installed in the Premises by Tenant. Tenant shall repair at its own expense, any injury or damage to the Premises resulting from such removal. Tenant shall not remove the following items: 1. Walk-in cooler; 2. Three bay sinks; 3. Vegetable sink; 4. Mop sink; and 5. Any existing counters.

# Article 4:    Use, Maintenance and Repair of Premises

## 4.01    Type of Business Use

Tenant shall use the Premises for a food service business including the sale of prepared foods and related items. Tenant agrees not to use the Premises in any other manner unless Tenant receives prior written consent from Landlord. Tenant further acknowledges and agrees that its business will in no way compete with the business of any other Tenant's business at the Center.

## 4.02    Manner of Use

Tenant shall use and occupy the Premises safely and carefully without committing or permitting waste, and Tenant's operations shall obey all laws, ordinances, rules, regulations, and orders of any governmental bodies having jurisdiction over the Premises. Tenant shall keep the Premises and appurtenances thereto in a clean, sightly and healthy condition, and not in violation of any building or health regulations.

Tenant agrees that it will not do, permit to be done, keep or suffer to be kept anything in, upon the Premises which will contravene Landlord's policies insuring against loss or damage by fire or other hazards, or which will increase Landlord's insurance premiums or prevent Landlord from procuring such policies with insurance companies acceptable to Landlord. Tenant shall not

3

use or occupy the Premises in any manner which will cause structural injury to the Premises of the building or any part of either as will constitute a public or private nuisance.

Tenant agrees not to obstruct the entrances, passages, stairways, hallways, common areas of the Center.

Tenant agrees that its management personnel and employees shall not park in front parking spaces in the Center, but shall park in the designated parking spaces in the rear of the Center. No deliveries are permitted to be made in the front of the Center except after sunset, but any deliveries to customers of Tenant may be made in front of the building.

Tenant will not keep or park any motorcycle owned or leased by Tenant at the Premises.

### 4.03    Maintenance by Tenant

Tenant is responsible for all maintenance of the hot water system, heating and air conditioning, plumbing, electrical, and all other maintenance except for structural maintenance which shall be and remain the responsibility of the Landlord. However, Tenant shall not be responsible for the repair or replacement of the heating and air conditioning system which shall be the responsibility of Landlord.

### 4.04    Common Area Maintenance

Landlord agrees to maintain a common area of the Center in good condition and repair and reasonably clear of all ice, snow, and debris during the term of this lease. This includes parking lot repairs and exterior lighting, except for Tenant's exterior signage lighting. Tenant's exterior signage lighting shall be maintained by Tenant.

### 4.05    Repairs by Landlord

Landlord shall provide all structural repairs to the Premises at Landlord's sole expense unless such repair is occasioned partially or wholly by the neglect or act of destruction by the Tenant, the other occupants of the Premises, Tenant's guests, or agents. For such negligent or destructive acts to the Premises, Tenant hereby assumes partial or total responsibility, as the case may be.

### 4.06    Right of Reasonable Access

Landlord reserves the right for herself to enter the Premises at all reasonable or necessary times to assure Tenant's compliance with this lease, to examine the condition of the Premises and/or to make repairs Landlord is required to make under this lease, to exhibit the Premises for sale or rent, or in the case of fire or other causes, for the protection of the interest of the Tenant and/or the Landlord, provided, however, that all such access shall be done in a manner to minimize any interference with the operation of Tenant's operations.

## Article 5:    Insurance and Allocation of Risk

### 5.01    Tenant's Insurance

Tenant covenants and agrees to indemnify, defend and save Landlord free and harmless from and against any damage, loss, or liability for injury to or death of persons and/or loss or damage to property occasioned by, growing out of, or arising or resulting from Tenant's use of the Premises. Tenant shall maintain during the term of this lease public liability insurance with a combined single limit of at least $1 million for personal injury, bodily injury, death, and property damage with the Landlord named as an additional insured.

4

### 5.02    Limitation on Landlord's Liability

Landlord should not be liable for the theft, destruction, loss, or damage of any property or personal injury of the Tenant, his agents or guests or for any property or personal injury to the Tenant, his agents or guests for the failure of heating or from plumbing, gas, water, steam or other pipes or fixtures, sewage, or the elements or damage arising from acts over which Landlord has no control. If the Premises are made untenable by casualty, Landlord shall not be obligated to provide Tenant with an alternate location. Landlord however shall be liable for all losses to Tenant arising from Landlord's failure to maintain or prior repair the Center in a timely and appropriate manner as required by this lease.

# Article 6:    Default

### 6.01    Default by Tenant.

If the rent provided for herein at any time be in arrears are unpaid for a period of 15 days, or if Tenant shall violate or fail to observe any of the other terms of this lease, which default shall not be remedied for a period of 10 business days after receipt of written notice from Landlord, Landlord shall be entitled to immediate possession of the Premises and may exercise all legal recourse available to Landlord under applicable law. Upon an event of default or breach in any terms of this lease, Tenant shall responsible for all reasonable attorney fees and costs for enforcement of this lease. Should Tenant be in default, a late fee of $100 per month or 10% of the balance due each month whichever is greater shall be paid by Tenant.

# Article 7:    General Provisions

### 7.01    Subletting or Assignment.

Tenant shall not sublet the Premises or any portion thereof, or assign this lease without the prior written consent of the Landlord, which consent shall not be unreasonably withheld. Landlord may assign the lease and upon any assignment of the lease shall be in fully enforceable by the S&E.:

### 7.02    Quiet Enjoyment.

Landlord hereby covenants and agrees that if all the covenants and agreements of Tenant previously agreed to are kept and fulfilled, Tenant shall have the right to quiet enjoyment and possession of the Premises during the term of the lease without hindrance or disturbance from Landlord or any person or persons lawfully claiming the Premises, subject to the specific provisions of this lease.

### 7.03    Notices.

Any notice required to be given to Tenant hereunder shall be sufficiently given in writing addressed to Tenant and mailed postage prepaid by certified mail, return receipt requested, to Tenant at the Premises or such other address Tenant may from time to time designate for that purpose in writing to Landlord. All notices to Landlord from Tenant shall be in writing and addressed to _____ .

### 7.04    Severability.

If any provision in this Lease is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this lease.

## 7.05    Binding effect.

The rights and obligations of any entity named or referred to in this Lease will be binding upon and will inure to the benefit of the successors or assigns of each party.

## 7.06    Captions.

The headings contained in this lease are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

## 7.07    Entire Agreement.

This Lease Agreement contains all of the express and exclusive terms and conditions and the complete and only understanding between the parties concerning its subject matter.  This Lease Agreement supersedes and replaces any prior agreements, whether oral or written, regarding the subject matter of this Agreement.

## 7.08    Execution in Counterparts.

This Lease Agreement may be executed by the parties in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## 7.09    Authorization to Execute Agreement.

The individuals signing this Lease Agreement and the persons and or entities on whose behalf such individuals are signing hereby represent and warrant that they are empowered and authorized to sign on behalf of and bind the persons and or entities for whom they have signed.

## 7.10    Amendments.

This Agreement may not be amended, modified, or supplemented except by an instrument in writing signed by all parties hereto.

## 7.11    Applicable Law

This Agreement shall be governed by the laws of the State of Ohio.

## 7.12    Approval by Bankruptcy Court

Landlord acknowledges that Tenant's obligations under this Lease are subject to prior approval by the Bankruptcy Court, and until approved by the Bankruptcy Court shall not be binding on the parties.

## 7.13    Reliance on Own Counsel

By entering into this Agreement, the parties represent that they have relied upon the advice of their respective attorneys, who are the attorneys of their own choice, concerning the legal and tax consequences of this Agreement, that the terms of this Agreement have been explained to them by their respective attorneys, and that the terms of this Agreement are fully understood and voluntarily accepted by them.

Agreed to by:                                           Agreed to by:


_____          _____
Gloria Longo ("Landlord")                          Olympic Restaurants LLC ("Tenant")

By Pete Moissis
Its Operations Manager

State of Ohio, County of_____
The foregoing instrument was acknowledged before me on this _____ (date) by
Gloria Longo

_____
Signature of Notary Public – State of Ohio
My commission expires: _____ (date)
State of Ohio, County of_____
The foregoing instrument was acknowledged before me on this _____ (date) by
Pete Moisis

_____
Signature of Notary Public – State of Ohio
My commission expires: _____ (date)

7